# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | 8:10CR210 |
|---|---|---|
| Plaintiff, | ) | ORDER |
| vs. | ) | and |
| IVELL M. HAGENS, | ) | FINDINGS AND RECOMMENDATION |
| Defendant. | ) | |

This matter is before the court on the Motion for Disclosure of Identity of Confidential Informant and Make Available for Interview (Filing No. 18) and Motion to Suppress (Filing No. 20) filed by defendant Ivell M. Hagens (Hagens). Hagens is charged in the Indictment with knowingly possessing a firearm and ammunition, which had been shipped and transported in interstate and foreign commerce, after a felony conviction in 2004 for possession of a stolen weapon, in violation of 18 U.S.C. § 922(g)(1). Hagens moves to disclose the identity of the confidential informant (CI) because the disclosure of the CI's identity, or the contents of communication with the CI, may be relevant and helpful to his defense. Further, Hagens moves to suppress all evidence obtained subsequent to a traffic stop because: (1) no reasonable articulable suspicion or probable cause existed for the initial stop of the vehicle; (2) Hagens' continued detention went beyond the scope of a legitimate traffic stop; and (3) the government cannot carry its burden of proving a valid warrantless search. The government filed a brief (Filing No. 23) in opposition to Hagens' motion to disclose the identity of the CI and a brief (Filing No. 33) in opposition to Hagens' motion to suppress.

The court held evidentiary hearings on the motions on August 12, 2010, June 15, 2011, and July 12, 2011. Hagens was present with his counsel, Assistant Federal Public Defender Jessica P. Douglas, during the first hearing and Federal Public Defender David R. Stickman during the later hearings. Assistant United States Attorney Russell X. Mayer represented the United States. During the hearings, the court heard the testimony of Federal Bureau of Investigation Agent Paris Capalupo (Agent Capalupo), Omaha Police Department (OPD) Officer John Hopkins (Officer Hopkins), OPD Sergeant Laurie Long

(Sergeant Long), Iris Hagens, and Shannon Sayers.  The court received into evidence the following Exhibits:  Exhibit 1 through 4 - photos of Bucky's gas station; Exhibit 5 - an OPD impounded vehicle report;  Exhibit 6 - an OPD property report; Exhibit 7 - OPD's towing policy p.18; Exhibit 8 - OPD's automobile inventory search policy; Exhibit 9 - a corrections personal property receipt; and Exhibit 101 - OPD's towing policy p.1-15a.  Transcripts of the hearings were filed on August 18, 2010 (TR32.) ([Filing No. 32](#)), June 23, 2011 (TR65.) ([Filing No. 65](#)), and July 19, 2011 (TR72.) ([Filing No. 72](#)).

## FINDINGS OF FACT

Agent Capalupo and OPD Officer Dave Bruck (Officer Bruck) worked as partners with the Greater Omaha Safe Streets Task Force (TR65. 8-9).  The two have patrolled together numerous times to target and disrupt gangs and drug organizations (TR65. 8-9). As part of the task force, Agent Capalupo and Officer Bruck work with confidential informants, contacting them via telephone, text message, or in person (TR65. 10-11).  On July 30, 2009, Agent Capalupo and Officer Bruck were assigned to patrol part of north Omaha during Native Days to assist other patrol units gathering intelligence on area gang activity (TR65. 12-13).  Agent Capalupo and Officer Bruck were in contact with a CI throughout the day on July 30, 2009 (TR65. 11).  The officers considered the CI to be reliable based on his previous activity, including participating in controlled narcotics and weapons purchases for officers and providing other truthful information (TR65. 12).

At approximately 8:15 or 8:30 p.m. on July 30, 2009, Agent Capalupo and Officer Bruck received a telephone call from the CI providing information about four males, including Hagens, armed with weapons, who were driving in a green Ford Taurus (Taurus) (TR65. 13, 16). Officer Bruck informed Agent Capalupo about Hagens' membership in the South Family Bloods Gang and Hagens' prior felony conviction for gun and drug possession (TR65. 14-15).  Upon receiving information about the four armed males from the CI, Officer Bruck made a broadcast over the radio with the vehicle information, including license plate number and color of the vehicle, and about the occupants, including that they were armed (TR65. 15).  Agent Capalupo and Officer Bruck conducted surveillance in a marked police vehicle at a location where they believed the Taurus would be located based on the CI's information (TR65. 10, 15).  Agent Capalupo and Officer

Bruck observed the unoccupied Taurus for a time and, while observing the Taurus, received information that the Taurus would depart with a few members of the party to get food (TR. 65, 15-16). Since all four members of the party would not be leaving, a second marked police vehicle was sent to conduct a traffic stop of the Taurus (TR65. 16). After the Taurus left, the second OPD marked unit stopped the Taurus (TR65. 16).

As a result of the stop, OPD Officers John Hopkins (Officer Hopkins) and Ken Fortune (Officer Fortune) identified the occupants of the vehicle, a female, Taniesha Mitchell, and a male, Damiean Pettis, checked for weapons, and released the vehicle (TR32. 20; TR65. 16, 54-55). Agent Capalupo and Officer Bruck continued surveillance at the location, where they observed the Taurus return (TR65. 16). As Agent Capalupo and Officer Bruck continued their surveillance, the CI told them the Taurus would leave again and the occupants would be armed (TR65. 16). A police helicopter and police units were alerted and a traffic stop of the Taurus was planned (TR65. 16). However, Agent Capalupo and Officer Bruck missed the departure of the Taurus and were unable to find it immediately after it departed (TR65. 17). Agent Capalupo and Officer Bruck returned to north Omaha to locate the vehicle (TR65. 17). Throughout the evening, Officer Capalupo continued to receive telephone calls from the CI trying to locate the parties in the Taurus (TR65. 17).

Later in the evening, around 11:30 to 11:50 p.m., Agent Capalupo received a phone call from the CI informing him the occupants of the Taurus were traveling to Cheaters Bar on 40th Street and Farnam (TR65. 17). In response, Officer Bruck placed a city-wide broadcast for the police to be on the lookout for the Taurus (TR 65. 17). Officers Hopkins and Fortune heard the broadcast, traveled to Cheaters Bar, and located the Taurus along with a white Buick (Buick) (TR65. 56). The Buick had not been seen by law enforcement prior to this time or mentioned in the radio broadcast to law enforcement (TR65. 42, 56). When Officers Hopkins and Fortune arrived and parked in their marked OPD vehicle, those inside and standing near the Taurus and Buick got into the vehicles and went to Bucky's gas station and convenience store (Bucky's) down the street on 40th Street and Dodge (TR65. 56-57, 60). The Buick and Taurus did not speed up in any way while traveling from Cheaters Bar to Bucky's (TR 65. 59). Officers Hopkins and Fortune followed the cars to Bucky's without activating their siren or lights (TR65. 60). Agent Capalupo and Officer

Bruck proceeded to the area around Cheaters Bar to attempt to search for the vehicle, ultimately parking across the street at a McDonald's on 40th Street and Dodge (TR65. 17). While parked at the McDonald's, an OPD unit told Agent Capalupo and Officer Bruck the Taurus was at Bucky's across the street on 40th Street and Dodge (TR65. 17). Agent Capalupo and Officer Bruck immediately proceeded to Bucky's and noticed the Taurus at the southernmost pump (TR65. 22). Agent Capalupo exited the vehicle with his gun drawn and observed the Taurus with no occupants and the Buick with an occupant, Matthew Donald (Donald), and another individual, Mark Jackson (Jackson), standing immediately outside the Buick (TR65. 23). Donald and Jackson matched the CI's description: black males, wearing white, black, and orange clothing (TR65. 23). Agent Capalupo told Donald and Jackson he was from the FBI, to put their hands up, and to get on the ground (TR65. 24). During this same time, Officer Bruck observed three individuals walking toward Bucky's entrance (TR65. 25). Officers Bruck, Hopkins, and Fortune stopped Hagens and two others as they walked toward Bucky's entrance (TR65. 25, 64). Officer Hopkins, not knowing the individual was Hagens or seeing him engage in any illegal activity, told Hagens to stop and get on the ground in order to frisk him for weapons (TR65. 25, 64-65, 84). Hagens was detained face-down on the ground with his hands behind his back and frisked (TR65. 84). Hagens was not found with any weapons on his person (TR65. 64-65). Hagens was not seen by law enforcement riding in the Taurus or engaging in illegal activity during any point of the evening (TR65. 42, 44).

  The police arrested five individuals at Bucky's, including Hagens (TR65. 25). Upon arrest, Hagens was asked about the ownership of the Buick, but he did not respond to any questions (TR65. 25). After being arrested, Hagens was placed in the back of a police vehicle (TR65. 84). Hagens was still unwilling to talk after being taken to police headquarters (TR65. 25). However, Donald told Agent Capalupo and Officer Bruck that Hagens was driving the Buick (TR65. 30). No one claimed ownership of the Buick at the scene (TR65. 34). Officers took the opportunity to look into the Taurus and while walking around the car, noticed a gun in the center console in plain view (TR65. 34-35). No one claimed ownership of the gun found in the Taurus (TR65. 35).

  Officer Bruck made the decision to impound the Taurus and the Buick (TR65. 34). The Buick was searched by Officer Hopkins and Agent Capalupo in Bucky's parking lot

4

after the call was made to impound the two vehicles (TR65. 35, 47, 75). Agent Capalupo looked into the Buick and saw a wallet on the driver's seat, then conducted a search of the front seat (TR65. 36). Agent Capalupo opened the wallet and found Hagens' driver's license and also found a .22 caliber handgun with seven rounds in it under the driver's seat (TR65. 37). Officer Hopkins also searched the Buick's trunk and found a 7.5 caliber MAS rifle in a baseball bat bag and eighty-six rounds of .40 caliber ammunition (TR65. 37-38). The Buick was then towed to the impound lot (TR65. 91). Nobody associated with Bucky's asked OPD to tow the vehicle (TR65. 88). Officer Hopkins prepared the impound vehicle and inventory report for the Buick, stating the Buick was towed for safekeeping and the only inventory seized related to guns and ammunition (TR65. 70, 74, 87). OPD Standard Operating Procedure for "violation tows" states, "Officers will inventory all personal property left in the vehicle prior to the time the vehicle is turned over to the tow truck driver" (Ex. No. 7). The inventory report failed to list all the items in the vehicle, including Hagens' wallet and identification (TR65. 44, 86).

The OPD Standard Operating Procedure for "towing" states, "Officers . . . do not have the authority to remove any vehicle parked on private or restricted property. The owner or tenant of the property will be responsible for having the vehicle towed off property" (Ex. No. 101). Officer Hopkins testified the Buick was on private property and OPD's policy was not to tow vehicles on private property (TR65. 88). Sergeant Long told the court that although OPD standards did not allow vehicles to be towed from private property, Bucky's is considered "quasi-public property" and different from a residence because it is open to the public (TR65. 105-6). A definition for quasi-public property, is not included in the policies of the towing section (TR65. 106-7; TR72. 25).

## LEGAL ANALYSIS

**1.    Motion to disclose identity of confidential informant**

"The need for protecting the identity of government informants is well recognized." *United States v. Foster*, 815 F.2d 1200, 1202-03 (8th Cir. 1987) (**citing** *Scher v. United States*, 305 U.S. 251, 254 (1938); *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). "In order to override the government's privilege of non-disclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to determination

of the case." *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001) (**quoting** *United States v. Harrington*, 951 F.2d 876, 877 (8th Cir. 2001)). Disclosure is only mandated when "it is vital to a fair trial." *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987).

The Supreme Court stated:

> We believe no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro*, 353 U.S. at 62; **see also** *Harris v. Taylor*, 250 F.3d 613, 616 (8th Cir. 2001).

Here, the government has asserted its privilege to withhold the identity of the source under **Roviaro**. The informant privilege is not absolute; it must give way when the defendant can show disclosure is material to his defense or to a fair determination of the cause. *Roviaro*, 353 U.S. at 60-61. Consequently, the government must disclose a CI's identity when the CI actively participated in and/or was a percipient witness to the underlying act or transaction which formed the basis for the Indictment. *Id.* at 63-65. "Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Devose v. Morris*, 53 F.3d 201, 206 (8th Cir. 1995) (footnote omitted). However, disclosure is not necessary if the CI acts as a "tipster," meaning a person who conveys information but does not witness or participate in the offense. *Bourbon*, 819 F.2d at 860. When a CI's involvement is limited to providing information relevant to the issue of probable cause, disclosure of the Ci's identity will not be required. *McCray v. Illinois*, 386 U.S. 300, 312-13 (1967).

In the present case, the CI did not witness or participate in the offense and simply told Agent Capalupo where Hagens was located, the type of vehicle he was riding in, and about Hagen's gun possession. Hagens argues the CI is a material witness and the CI's identity and whereabouts must be revealed. Here, however, the CI was not a percipient witness because he simply conveyed information about Hagens to law enforcement.

Further, Hagens did not establish beyond mere speculation the CI's testimony would be material to the determination of the case and its vitality to a fair trial. Therefore, the motion to disclose the CI's identity is denied.

**2.    Motion to suppress**

Police officers may make a valid investigatory stop of a vehicle based on reasonable suspicion the occupants of the vehicle are engaged in criminal activity.  **See** *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Terry v. Ohio*, 392 U.S. 1, 25-31 (1968).  The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; **see** *Long*, 532 F.3d at 795.  "Reasonable suspicion requires more than a general hunch, but only that police articulate some minimal, objective justification for an investigatory stop.  [In any event, t]he standard is less difficult to meet than the probable cause standard required for arrests." *Long*, 532 F.3d at 795 (internal quotations and citations omitted).

The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997).  This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989)).

Moreover, the Eighth Circuit previously stated, "We do not hold . . . . that a car can be stopped without a warrant merely because that car is driving in tandem with another vehicle whose occupants (of the latter vehicle) are reasonably suspected of criminal conduct; rather, it is one factor to be considered in determining whether reasonable suspicion exists."   *United States v. Owens*, 101 F.3d 559, 561 (8th Cir. 1996). Additionally, "association with a vehicle connected with past criminal activity will sometimes suffice notwithstanding absence of grounds for arrest."   4 Lane R. LaFave, *Search &*

*Seizure* § 9.5(f) (4th ed. 2010). However, association with an organization or group, such as membership in a street gang, does not sufficiently establish "reasonable suspicion." *Id*.

In this instance, the police improperly conducted an investigatory stop of the Buick because the stop was not based on reasonable suspicion the occupants of the Buick were engaged in criminal activity. The government argues that Officer Bruck knew of Hagens' prior criminal acts and that Hagens was carrying a gun. However, it was Officer Hopkins who stopped Hagens. Officer Hopkins did not know Hagens' identity when he stopped and frisked him. While Hagens was detained and frisked, Officer Hopkins did not find a firearm on Hagens' person but proceeded to place Hagens in a police cruiser. Hagens did not act unreasonably or perform any act that constituted a criminal offense for arrest. Additionally, Hagens was not seen by law enforcement riding in the Taurus or engaging in illegal activity prior to his stop, frisk, and arrest.

Further, the CI did not mention the presence of the Buick with the Taurus during any of the discourse that evening. Moreover, although the Buick and Taurus drove from Cheaters Bar to Bucky's for a short distance, the two cars did not speed or violate any traffic laws in the course of travel. The Buick and Taurus did not travel for an extended distance to give the appearance of driving in tandem. Hagens' membership in the South Family Bloods Gang did not sufficiently establish reasonable suspicion. Considering these factors together, the court concludes the stop was not based on reasonable suspicion that Hagens or any other occupant of the Buick was engaged in criminal activity.

The motion to suppress should also be granted because the search did not fit within the inventory exception to the Fourth Amendment warrant rule. Inventory searches are "a well-defined exception" to the warrant requirement of the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). Such searches are supported by several governmental interests, including "protect[ing] an owner's property while it is in the custody of the police, . . . insur[ing] against claims of lost, stolen, or vandalized property, and . . . guard[ing] the police from danger." *Id.* at 372. Probable cause or a warrant are not necessary during an inventory search because the focus is on "community caretaking" rather than "criminal investigation." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (**citing** *United States v. Marshall*, 986 F.2d 1171 (8th Cir. 1993)). However, the Eighth Circuit has determined an inventory search must be reasonable under the totality

8

of the circumstances. *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007). The Supreme Court specifically stated inventory searches may not be "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Moreover, "the validity of an impoundment is not dispositive of the validity of an inventory search." *Taylor*, 636 F.3d at 464-65 (**citing** *United States v. Rowland*, 341 F.3d 774 (8th Cir. 2003)).

When carrying out a valid inventory search, officers must act in good faith according to standardized inventory procedures, and must not act for purposes of investigation. *Bertine*, 479 U.S. at 372-75 & n.6. Reasonableness for inventory searches can generally be met when it is done in alignment with standardized police procedures. *Taylor*, 636 F.3d at 464 (internal citation omitted). However, if the police disregard standardized inventory search procedures, the search is not considered unreasonable, unless it is a pretext for an investigatory search. *Id.* at 465. "Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *Rowland*, 341 F.3d at 780 (**citing** *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Rowland*, 341 F.3d at 780 (**quoting** *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993)). Unwritten practices by law enforcement do not erode or dissolve written procedures. *Rowland*, 341 F.3d at 780. Further, "a police department may not avoid the constitutional requirement of probable cause simply by adopting a standard policy based only on a 'belief' that the vehicle was involved in the commission of a crime and has evidentiary value." *Taylor*, 636 F.3d at 466 (**quoting** *United States v. Sims*, 424 F.3d 691, 693 (8th Cir. 2005)).

In this instance, the officers did not act in good faith according to standardized inventory procedures when they conducted an investigatory search. The OPD standards for towing do not allow officers to remove a vehicle parked on private or restricted property. Per OPD standards, it is the responsibility of the tenant or owner of the private business to tow the vehicle off the property. Nobody associated with Bucky's asked OPD to tow the vehicle. Although Sergeant Long testified Bucky's was considered "quasi-public property,"

9

the government did not submit any evidence alluding to OPD policies regarding quasi-public property. The officers disregarded OPD standardized inventory search procedures, which require officers to inventory *all* personal property left in the vehicle prior to towing. Specifically, the officers failed to list the wallet and identification as part of the post-inventory report. Additionally, they inappropriately relied on the "belief" the vehicle was involved in the commission of a crime because it was seen together with the Taurus for a short time from the Cheaters Bar to Bucky's. OPD's actions constituted "general rummaging in order to discover incriminating evidence" and were not reasonable under the totality of the circumstances. Therefore, the motion to suppress should be granted.

**IT IS ORDERED:**

Ivell M. Hagens' Motion for Disclosure of Identity of Confidential Informant and Make Available for Interview ([Filing No. 18](Filing No. 18)) is denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Ivell M. Hagens' Motion to Suppress ([Filing No. 20](Filing No. 20)) be granted.

**ADMONITION**

Pursuant to [NECrimR 59.2](NECrimR 59.2) any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 29th day of July, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge